# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

CAYUGA NATION, a federally )
recognized Indian Nation; and )
  )
LAKESIDE ENTERPRISES, INC.; )
  )
         *Plaintiffs*, )
    v. )
  )
NEW YORK STATE LIQUOR )
AUTHORITY; )
  )
LILY FAN, in her official capacity as the )
Chair and Commissioner of the New York )
State Liquor Authority; )
  )
EDGAR DE LEON, in his official capacity )
as a Commissioner of the New York State )
Liquor Authority; and )
  )
JOHN MAYA, in his official capacity as a )
Commissioner of the New York State )
Liquor Authority, )

         *Defendants*.

Civil Action No.  5:25-cv-1312 (ECC/TWD)

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

**DEMAND FOR JURY TRIAL**

Plaintiffs Cayuga Nation (the "Nation") and Lakeside Enterprises, Inc. ("Lakeside"), as and for its Complaint against the above-named Defendants, hereby allege as follows:

## NATURE OF THE ACTION

1.     This is an action to enjoin the New York State Liquor Authority ("SLA"), its Chair Lily Fan, Commissioner Edgar De Leon and Commissioner John Maya, from continuing violations of federal law that infringe upon the Cayuga Nation's federally protected rights. Specifically, the SLA has discriminatorily treated, continues to discriminate against the Nation, and effectively

1

denied the Nation's liquor license application for operations on its 64,015-acre federally recognized Reservation in the Finger Lakes region of New York (the "Reservation"), in contravention of federal law including 18 U.S.C. § 1161 and 42 U.S.C. § 1983.

2.      The official-capacity Defendants, Chair Lily Fan, Commissioner Edgar De Leon, and Commissioner John Maya, are named pursuant to *Ex parte Young*, 209 U.S. 123, 123 (1908) and its progeny, which allow declaratory and injunctive relief against state officials in their official capacities to stop ongoing violations of federal law, notwithstanding the immunity afforded to States under the Eleventh Amendment of the United States Constitution, as a State does not have, and therefore cannot confer on its individual officers, any authority to violate federal law.

3.      18 U.S.C. § 1161 expressly authorizes the sale of alcoholic beverages on Indian lands where the transaction complies with both (1) the laws of the state and (2) a valid ordinance of the Indian nation or tribe, certified by the Secretary of the Interior. The Nation has enacted such an ordinance, and it has been duly certified and published in the Federal Register. Nonetheless, the SLA has refused to issue a license on grounds that are inconsistent with the framework set forth in § 1161, and that have not been applied equally to similarly situated non-Indian applicants.

4.      The SLA's effective denial is also rooted in discriminatory reasoning that singles out the Cayuga Nation for disfavored treatment in violation of the Equal Protection Clause of the Fourteenth Amendment and actionable under 42 U.S.C. § 1983. Defendants' remarks and conduct reflect an unfounded belief that the Nation would not comply with state law—despite offering no evidence to support that concern. In fact, the Nation currently holds two SLA-issued beer licenses for separate Nation-owned establishments, both of which remain in good standing with no history of violations. The SLA's suspicion of noncompliance, in the absence of any contrary evidence and

in the face of a clean regulatory record, reflects discriminatory and preconceived notions about Native nations and alcohol regulation, rather than any legitimate basis for denial.

5.     Unless enjoined, Defendants will continue to violate the Nation's rights under federal law, causing irreparable harm to the Nation's sovereign interests, self-governance, and ability to promote economic development for its citizens. The Nation seeks declaratory and injunctive relief to halt Defendants' unlawful and discriminatory practices and to ensure that the Nation may exercise its rights under § 1161 and the Constitution without unlawful obstruction.

## PARTIES

6.     Plaintiff Cayuga Nation is a federally recognized Indian nation.  *See* Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 88 Fed. Reg. 54,654, 54,655 (Aug. 11, 2023).  The Nation is governed by the Cayuga Nation Council.

7.     Plaintiff Lakeside Enterprises, Inc. ("Lakeside") is a wholly owned business of the Cayuga Nation, organized and operated under the Nation's laws. Lakeside is the applicant of record in the liquor license application at issue in this case.

8.     Defendant New York State Liquor Authority is a state agency charged with regulating and controlling the manufacture, sale, and distribution of alcoholic beverages within New York State pursuant to the Alcoholic Beverage Control Law ("ABC Law").

9.     Defendant Lily Fan is the Chair of the New York State Liquor Authority. She is sued here only in her official capacity.

10.     Defendant Edgar De Leon is a Commissioner of the New York State Liquor Authority. He is sued here only in his official capacity.

11.     Defendant John Maya is a Commissioner of the New York State Liquor Authority. He is sued here only in his official capacity.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because the claims at issue arise under federal law; 28 U.S.C. § 1362, because this action is brought by an Indian nation and arises under federal law; and 28 U.S.C. § 2201, because Plaintiffs are moving under the Declaratory Judgment Act.

13.     This Court has federal question jurisdiction because the Complaint alleges ongoing violations of the Nation's Reservation rights pursuant to federal law, including 18 U.S.C. § 1161 and 42 U.S.C. §§ 1981, 1983, 1985.

14.     This Court has jurisdiction to grant prospective injunctive and declaratory relief under the Court's inherent equitable powers, and under *Ex parte Young*, 209 U.S. 123 (1908) against the named New York State officials, Lily Fan, Edgar De Leon, and John Maya.

15.     This Court has personal jurisdiction over Defendant SLA, Chair Lily Fan, Commissioner Edgar De Leon, and Commissioner John Maya because SLA maintains offices in this District, does business in New York and in this District, and because many of the acts complained of and giving rise to the claims alleged herein occurred in this District.

## FACTUAL BACKGROUND AND ALLEGATIONS

### A.  Statutory Authority Regarding Liquor Regulation on Indian Lands

16.     Federal law generally prohibits the introduction, possession, or sale of intoxicating liquors in "Indian country." *See* 18 U.S.C. § 1154(a). However, Congress created a specific exception to that prohibition in 18 U.S.C. § 1161, which authorizes liquor transactions on Indian lands under a dual compliance framework involving both tribal and state law.

17.     Specifically, section 1161 provides that:

> The provisions of sections 1154, 1156, 3113, 3488, and 3669, of this title, shall not apply within any area that is not Indian country, nor

to any act or transaction within any area of Indian country provided such act or transaction is in conformity both with the laws of the State in which such act or transaction occurs and with an ordinance duly adopted by the tribe having jurisdiction over such area of Indian country, certified by the Secretary of the Interior, and published in the Federal Register.

18.    Congress enacted § 1161 in 1953 to eliminate the racially discriminatory federal ban on alcohol in Indian country while preserving the ability of Indian nations to regulate such commerce internally. Legislative history confirms that Congress intended to establish a cooperative regulatory model between states and Indian nations—not to impose exclusive or discretionary state control. *See* Hearings on H.R. 1055 Before the Subcommittee on Indian Affairs of the House Committee on Interior and Insular Affairs 83d Cong., 1st Sess. (1953).

19.    Congressional hearings preceding the enactment of § 1161 emphasized the desire to treat Indian nations on equal terms and to eliminate federal interference with local liquor policy. Commissioner Dillon Myer testified that the law would end discrimination while respecting state prerogatives. *See* Hearings on H.R. 1055 Before the Subcommittee on Indian Affairs of the House Committee on Interior and Insular Affairs 83d Cong., 1st Sess. (1953). Representative Patten, the bill's sponsor, stressed that Indian nations could "regulate internally" but would still be required to "comply with State law in every regard." *See id.* However, nothing in the hearings or statutory text conferred discretionary veto authority to states over Indian alcohol regulation.

20.    The U.S. Supreme Court confirmed this cooperative framework in *Rice v. Rehner*, 463 U.S. 713 (1983), holding that Congress intended § 1161 to legalize liquor transactions on Indian lands only where they conform to both a federally certified tribal ordinance and the laws of the state. The Court recognized concurrent authority, but not unilateral state discretion to frustrate Indian nations' rights under federal law.

21.    In dissent, Justice Blackmun warned that nothing in § 1161 or its legislative history authorized states to impose discretionary licensing regimes on Indian nations. *See Rice v. Rehner*, 463 U.S. 713, 741 (1983) (Blackmun, J., dissenting). He emphasized that federal statutes delegating state regulatory authority over Indian affairs must do so explicitly. *See id.* at 742. The dissent cited longstanding federal regulation of Indian traders and reaffirmed principles of Indian self-governance, concluding that subjecting Indian businesses to state licensing schemes absent explicit congressional authorization was unlawful. *See id.* at 735-38, 744.

22.    Consistent with this history, § 1161 does not authorize states to impose heightened or discriminatory burdens on Indian nations, nor does it permit state officials to deny applications based on vague or subjective criteria inconsistent with the cooperative framework Congress envisioned. The statute contemplates a ministerial, non-discretionary role for states, limited to ensuring general conformity with statewide alcohol laws.

23.    Accordingly, state agencies such as the SLA may not use vague, arbitrary, or discriminatory standards to deny applications from Indian nations who are acting pursuant to a valid federal ordinance and seeking to engage in lawful alcohol sales on their own lands. A federal court has recognized that claims may proceed under § 1161 where a state attempts to impose unlawful conditions on alcohol licensure in Indian country. *See Flandreau Santee Sioux Tribe v. Gerlach*, 155 F. Supp. 3d 972, 992 (D.S.D. 2015).

**B.  The Nation's Reservation**

24.    In 1794, the United States entered the Treaty of Canandaigua with the Cayuga Nation, and certain other Indian nations in New York, to resolve significant disputes that existed between the United States and those Indian nations. Treaty of Canandaigua, Preamble, 7 Stat. at 44.

25.     In the Treaty of Canandaigua, the United States recognized a federal reservation for the Cayuga Nation comprising 64,015 acres—located within what today are Seneca County, New York (which is located within the federal Western District of New York) and Cayuga County, New York (located within the federal Northern District of New York)—and pledged that the "reservation[] shall remain theirs, until they choose to sell the same to the people of the United States, who have the right to purchase." Treaty of Canandaigua, art. II, 7 Stat. at 45.

26.     In the years following the Treaty of Canandaigua, New York State claimed to enter into two treaties directly with the Cayuga Nation. In 1795, by the Treaty of Cayuga Ferry, the State claimed to acquire the Cayuga Nation's entire Reservation, with the exception of a three square-mile area on the eastern shore of Cayuga Lake, in exchange for a promise to pay the Nation $1,800 annually in perpetuity. In the 1807 Treaty with the Cayugas, the State claimed to purchase the Cayuga Nation's remaining three square-mile parcel for $4,800.

27.     However, because these two treaties with the State of New York "indisputably violated the Non-Intercourse Act, and were never subsequently approved through the federal treaty-ratification procedures," as a matter of law they are void and never "had any effect on the legal status of the Cayuga reservation," which remains fully intact. *Cayuga Indian Nation of N.Y. v. Seneca Cnty.,* 260 F. Supp. 3d 290, 309–10 (W.D.N.Y. 2017) (collecting cases).

28.     To this day, Congress has not disestablished the Nation's Reservation, nor authorized the sale of the Nation's reservation lands, *see generally id.* at 307-15 (collecting authorities), and "every federal court that has examined whether the Cayuga reservation was disestablished or diminished by Congress has answered that question in the negative." *Cayuga Indian Nation of N.Y. v. Gould,* 14 N.Y.3d 614, 639 (2010) (collecting cases).

29.    The Nation's 64,015-acre Reservation established by the Treaty of Canandaigua remains fully intact today.

**C.  The Nation's Alcohol Ordinance**

30.    The Cayuga Nation has exercised its sovereign authority to regulate alcohol sales on its Reservation through the enactment of the Cayuga Nation Alcoholic Beverage Control Ordinance (the "Ordinance"). The Ordinance establishes a comprehensive regulatory scheme governing the manufacture, distribution, and sale of alcoholic beverages on Nation lands.

31.    The Ordinance was duly adopted by the Cayuga Nation Council, the Nation's governing body, and submitted to the United States Department of the Interior for certification pursuant to 18 U.S.C. § 1161. On July 2, 2021, the Bureau of Indian Affairs published notice of the Ordinance's approval in the Federal Register. *See* Cayuga Nation's Alcoholic Beverage Control Ordinance, published in the Federal Register at 86 Fed. Reg. 35326 (July 2, 2021). A copy of the Nation's Ordinance is annexed as **Exhibit A**.

32.    Pursuant to the Ordinance, all alcohol sales on the Reservation must be licensed by the Nation's Alcoholic Beverage Control Commission. The Nation has established licensing criteria, inspection protocols, and enforcement procedures to ensure compliance with federal and applicable state law.

33.    Following the adoption of the Ordinance, the Nation successfully obtained and has continuously maintained two on-premises beer licenses from the SLA for separate Nation-owned establishments on its Reservation. Both licenses remain in good standing, and the SLA has not issued any violations or raised any concerns regarding health, safety, or regulatory compliance in connection with the operation of these establishments.

### D.  The Nation's License Application

34.    On September 26, 2024, Lakeside submitted an application to the SLA seeking the Nation's first license to sell alcoholic beverages at a planned convenience store and gas station located on the Nation's Reservation.

35.    Lakeside's proposed retail operation is located entirely within the Cayuga Nation's federally recognized Reservation and is governed by the Nation's duly certified Ordinance, approved by the U.S. Department of the Interior pursuant to 18 U.S.C. § 1161.

36.    Lakeside's application confirmed its intention to comply with both the Nation's Ordinance and all generally applicable provisions of New York law, including those governing hours of sale, signage, and retail display. A copy of the application is annexed as **Exhibit B**.

37.    That same day, September 26, 2024, the SLA acknowledged receipt of the application. A copy of that letter is annexed as **Exhibit C**.

38.    On January 31, 2025, the SLA issued a deficiency letter requesting clarification and supplemental documentation. Among the items requested were: (1) a copy of the penal bond signed by a principal; (2) photographs of the entire premises; and (3) a completed corporate holding stipulation disclosing the Nation's ownership structure. A copy of the deficiency letter is annexed as **Exhibit D**.

39.    On February 14, 2025, Plaintiffs timely submitted a comprehensive response to the SLA's letter, addressing each of the requested items and informing the SLA of a recent corporate change. A copy of the response is annexed as **Exhibit E**.

40.    On February 21, 2025, the SLA responded via email, requesting additional amendments to the application materials, specifically in connection with the corporate change. A copy of the SLA's February 21 email is annexed as **Exhibit F**.

41.     On February 28, 2025, Plaintiffs submitted the requested amendments and provided further documentation to satisfy the SLA's remaining concerns. A copy of Plaintiffs' February 28 submission is annexed as **Exhibit G**.

42.     On March 7, 2025, the SLA emailed Plaintiffs to request that an inadvertent duplicate application that was submitted be withdrawn. A copy of the SLA's email is annexed as **Exhibit H**.

43.     Plaintiffs promptly complied, and that same day submitted a formal letter requesting withdrawal of the duplicate application. A copy of the withdrawal letter is annexed as **Exhibit I**.

44.     On March 12, 2025, Plaintiffs sent a follow-up email enclosing a letter confirming approval of the corporate change and requesting confirmation that all outstanding items had been resolved. A copy of the March 12 email and letter is annexed as **Exhibit J**.

45.     On April 3, 2025, the SLA informed Plaintiffs via email that the application had been reviewed by the SLA Licensing Board and would be referred to the Full Board for final consideration. The SLA also requested a block plot diagram of the premises and disclosure of whether any principal had relatives who owned or were employed by any licensed liquor or wine stores. A copy of the April 3 email is annexed as **Exhibit K**.

46.     Plaintiffs promptly responded on April 7, 2025, submitting the requested diagram and information. A copy of the April 7 email and accompanying letter is annexed as **Exhibit L**.

47.     On April 16, 2025, the SLA notified Plaintiffs that the application would be scheduled for review by the Full Board at its May 14, 2025, hearing. The SLA's letter stated: "If you are the applicant, you are *strongly encouraged* to appear to be heard in support of your case." A copy of the April 16 notice is annexed as **Exhibit M**.

48.     Upon reviewing the detailed agenda for the May 14 hearing, counsel for Plaintiffs discovered that two protest letters had been submitted in opposition to the application. A copy of the agenda set for the May 14, 2025, hearing is annexed as **Exhibit N**.

49.     On May 7, 2025, counsel for Plaintiffs emailed the SLA requesting copies of the protest materials. A copy of the May 7 request is annexed as **Exhibit O**.

50.     Later that same day, the SLA responded by email and provided the two letters of opposition—one submitted by DA's Liquors and the other by P&C Liquor Corp., both local competitors in Seneca Falls. A copy of the SLA's response and the opposition letters are annexed as **Exhibit P**.

51.     The letter from P&C Liquor Corp. objected to the application on the grounds that there was "no demonstrated need" for an additional liquor store in Seneca Falls and that granting the license would "oversaturate the market," harm existing tax-paying businesses, and create a "'one-stop shop' for customers without any tax liability." The letter argued that it was "unfair" to permit a business that purportedly did not "adhere to the same financial responsibilities," and warned that approval would "contribute to increased alcohol-related incidents, loitering, and other negative social impacts."

52.     The letter from DA's Liquors similarly objected to the application on economic grounds, expressing concern that the Cayuga Nation's sovereign status would allow Lakeside to sell liquor at lower prices by avoiding New York sales tax and purchasing products outside the state's distribution system. DA's warned that this would "destroy" its business and create an uneven playing field for licensed state businesses.

53.     On May 14, 2025, counsel for Plaintiffs appeared before the SLA Board to present the application and respond to any questions. The Cayuga Nation principal was unable to attend

the meeting due to prior commitments and the significant travel burden from the Reservation in the Finger Lakes region to New York City.

54.     Although counsel was fully prepared to address the Board's questions, the SLA expressed visible dissatisfaction with the absence of a Nation principal. Chair Fan stated: "With the utmost respect, I'm going to ask your clients to come. At least send representatives. I know that you guys have a way you do things, and we have a way we do things here. We always ask the applicant to come." The Board then deferred consideration of the application until June 4, 2025, stating that the applicant must appear in person to speak to "public convenience and advantage."

55.     In response, the Nation prepared a comprehensive supplemental submission dated May 28, 2025, addressing the SLA's stated concerns. The letter reiterated the cooperative framework established by 18 U.S.C. § 1161, emphasized the Nation's sovereign regulatory authority, and provided documentation confirming that the application met all applicable statutory and regulatory requirements. A copy of the Nation's May 28 submission is annexed as **Exhibit Q**.

56.     On June 3, 2025, counsel for Plaintiffs again inquired whether any additional opposition materials had been received. A copy of the June 3 email is annexed as **Exhibit R**.

57.     That same day, the SLA responded by disclosing a second letter submitted by P&C Liquor Corp. This follow-up letter accused Lakeside Enterprises and the Cayuga Nation of seeking to create a "tax-exempt one-stop shop" that would sell "untaxed fuel, untaxed cigarettes, unregulated cannabis, gambling, and liquor—all under one roof." The letter urged the SLA to deny the license on the ground that the Nation's operations were "dangerous," "unfair," and posed a "serious threat to the integrity of the local business landscape." A copy of the SLA's response and the additional letter is annexed as **Exhibit S**.

58.     On June 4, 2025, the SLA held a hearing on the application. Counsel for Plaintiffs again appeared and offered to answer all questions. However, the Nation's principal was unable to attend due to scheduling conflicts. Counsel explained the circumstances and reiterated that the applicants had complied with all legal requirements, submitted a detailed record, and that there was no statutory or regulatory requirement mandating a principal's personal appearance.

59.     The SLA Board nevertheless denied the application. Chair Fan expressed concerns that the Nation would not abide by SLA rules and regulations, raised unspecified "public safety concerns," and questioned "who was trafficking the alcohol." She further stated that she wanted to "get comfort that there's appropriate fitness and character here," and remarked that she could not "assess the fitness and character" of the applicant without a personal appearance. Commissioner Maya characterized the Nation's legal position—that personal appearance is not legally required—as "provocative," and the Board concluded that there was no "public convenience and advantage" warranting approval.

60.     On June 11, 2025, the SLA issued a Preliminary Notice of Disapproval indicating formal written reasons for disapproval would be provided. A copy of the notice is annexed as **Exhibit T.**

61.     On July 2, 2025, upon the SLA's recommendation, the Nation submitted a letter to the SLA requesting reconsideration of the application, accompanied by an affidavit from Michele "Missy" Barringer, Chief Operating Officer, in support of the request. The letter and affidavit reiterated that the Nation intends to operate the establishment lawfully, safely, and in full compliance with all applicable requirements. A copy of the letter and affidavit is annexed as **Exhibit U**.

62.     On July 11, 2025, counsel for Plaintiffs emailed Ms. Shannon Sarfoh, General Counsel for the SLA, noting that Plaintiffs had submitted a letter request for reconsideration of the Full Board's denial on July 2, 2025. Counsel explained that, to date, Plaintiffs had not received acknowledgment of the request nor confirmation that the reconsideration application would be placed on the Board's July 16, 2025, agenda. Counsel advised that the Nation had authorized litigation if the reconsideration request was not heard at that meeting, and, as a courtesy, attached a draft complaint. Counsel emphasized that the Nation hoped litigation could be avoided if the Full Board reviewed the reconsideration request on July 16, 2025, but made clear that the Nation had directed the suit be filed on July 17, 2025, if reconsideration was not heard. A copy of the email is annexed as **Exhibit V.**

63.     On July 14, 2025, Ms. Sarfoh telephoned Plaintiffs' counsel to communicate that the Nation's reconsideration request would be heard at the SLA's upcoming hearing.

64.     Later that same day, Plaintiffs' counsel sent a follow-up email confirming in writing the substance of that conversation. Ms. Sarfoh responded by email that day, confirming that the reconsideration request would be taken up at the SLA's August 6, 2025, hearing. A copy of this email exchange is annexed as **Exhibit W**.

65.     On July 31, 2025, counsel for Plaintiffs again inquired whether any additional opposition materials had been received. That same day, the SLA wrote back that "[n]o new opposition materials have been received for this matter." A copy of this email exchange is annexed as **Exhibit X**.

66.     On August 6, 2025, the SLA held a hearing at which both Plaintiffs' counsel and Mr. Barringer appeared on behalf of the Nation. The SLA first voted to approve the request for reconsideration. The Board then heard argument from counsel and testimony from Ms. Barringer

concerning the Nation's alcohol regulatory ordinance, prior history of compliance with SLA beer licenses, security protocols, and the Nation's commitment to responsible alcohol sales.

67.     During the hearing, Commissioners made a series of disparaging and dismissive remarks, including whispered comments such as "we can say… I mean… I want to kick it," reflecting an attitude of hostility and bias toward the Nation's application.

68.     The Commissioners also expressed concerns that the Nation would be unable to adequately enforce laws prohibiting underage drinking because, in their view, the State had "very limited enforcement power on the land" and therefore oversight would rest "sort of in [the Nation's] hands." The questioning suggested that, unlike other applicants, the Nation's sovereign status was being treated as a reason to doubt its ability to comply with alcohol control laws, despite evidence of the Nation's unblemished compliance history with SLA beer licenses and the Nation's detailed explanation of its police department, security protocols, and regulatory track record.

69.     Following questioning by the Commissioners on zoning, sales tax, management, and enforcement concerns, the Board announced that it would not reach a final determination that day. Instead, the SLA adjourned the matter to the August 26, 2025, hearing to allow its licensing staff to review additional information and data before rendering a decision. The Commissioners expressly instructed that neither Ms. Barringer nor any Nation representative needed to appear at the adjourned hearing, further noting that Plaintiffs' counsel could attend but was not required. As Chair Fan explained, "[Ms. Barringer,] you do not need to come back. Counsel can come back, but you do not need to come back on August 26. I appreciate that counsel has already been here three times, and I think we've asked all the questions of Ms. Barringer right here of the Nation. We're good with the quality of the responses."

70.    On August 18, 2025, counsel for Plaintiffs again inquired whether any additional opposition materials had been received. On August 19, 2025, the SLA confirmed that there had not been any new opposition letters submitted by other parties since June 3, 2025. A copy of this email exchange is annexed as **Exhibit Y**.

71.    On August 25, 2025, Plaintiffs were advised that their application would be adjourned to the September 18, 2025, Board hearing. A copy of this email is annexed as **Exhibit Z.**

72.    In the days leading up to the September 18, 2025, Board hearing, the SLA published its detailed licensing agenda, which specifically stated that "[o]nly the applicant's attorney needs to appear" at the next hearing. A copy of this agenda is annexed as **Exhibit AA**.

73.    On September 16, 2025, Plaintiffs were again advised that their application would not be heard at the September 18, 2025, Board hearing. No explanation for this further adjournment was provided. Plaintiffs received only a brief notification that their matter would be deferred, with no indication of when the application would next be scheduled.

74.    On September 17, 2025, counsel for Plaintiffs received an email from the SLA's Secretary's Office confirming the adjournment. The email further advised that the matter would not be considered until the Full Board hearing on October 29, 2025—an additional delay of six weeks.  This email reversed the SLA's prior position and directly contradicted both the Commissioners' express statements at the August 6 hearing and the published agenda for September 18, by newly stating that "[i]t is also requested that the applicant appears as well." A copy of this email is annexed as **Exhibit AB**.

75.    Further, the SLA's own Full Board calendar does not list October 29, 2025, as the next scheduled meeting date. Instead, the calendar reflects that the next Full Board hearing is set

for October 9, 2025. By identifying a later date, the SLA is unnecessarily delaying consideration of Plaintiffs' application. A copy of this calendar is annexed as **Exhibit AC**.

76.    As a result, Plaintiffs' application has now been adjourned twice, each time without explanation or justification. The repeated postponements, coupled with the absence of any explanation in the official notices, have left Plaintiffs unable to understand or address the basis for the delays.

77.    To date, the SLA has not issued any formal written notice of disapproval. However, Defendants' preliminary disapproval, remarks made in public meetings, repeated adjournments, and refusal to reach a timely determination amount to an effective denial of Plaintiffs' application. By unnecessarily prolonging the licensing process, Defendants are obstructing Plaintiffs' ability to lawfully engage in alcohol sales and treating the Nation differently than other applications. This pattern of delay operates as a discriminatory barrier and carries the same effect as a denial of Plaintiffs' application.

<u>**FIRST CAUSE OF ACTION**</u>
**(Violation of 18 U.S.C. § 1161)**
**(Against all defendants)**

78.    Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs as if fully set forth herein.

79.    Under 18 U.S.C. § 1161, alcohol transactions on Indian lands are permitted only where conducted in conformity with both (1) the laws of the State in which such act occurs, and (2) an ordinance duly adopted by the Indian nation and certified by the Secretary of the Interior.

80.    The Cayuga Nation has duly enacted and certified an Alcoholic Beverage Control Ordinance that has been approved by the United States Department of the Interior and published in the Federal Register.

81.     The Nation's Ordinance establishes a comprehensive and lawful framework for the regulation of alcohol sales on its Reservation, consistent with federal law and the cooperative regulatory structure Congress intended under § 1161.

82.     Despite this, Defendants have applied a discretionary and one-sided licensing regime to the Nation's liquor license application that exceeds the authority contemplated under § 1161 and frustrates the statute's cooperative purpose.

83.     The prolonged delay and effective denial of the Nation's application on pretextual grounds constitutes an unlawful impediment to the Nation's right to engage in alcohol sales on its own Reservation, and undermines the joint regulatory model intended by Congress in 18 U.S.C. § 1161.

84.     As a direct and proximate result of the foregoing, Plaintiffs have suffered harm, including the effective denial or obstruction of a valid license application, and the frustration of its sovereign and economic interests.

85.     By reason of the above, Defendants have violated 18 U.S.C. § 1161, and Plaintiffs are entitled to declaratory and injunctive relief to prevent further violations of their rights under federal law.

## SECOND CAUSE OF ACTION
### (Violation of 42 U.S.C. § 1983)
### (Against Defendants Fan, De Leon, and Maya)

86.     Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs as if fully set forth herein.

87.     The Fourteenth Amendment guarantees all persons within a state's jurisdiction the equal protection of the laws. This protection extends to federally recognized Indian nations asserting the rights of their members and instrumentalities.

88.     Through 42 U.S.C. § 1983, Plaintiffs are entitled to redress for violations of their constitutional rights committed under color of state law.

89.     At all times relevant to this Complaint, Defendants Fan, De Leon, and Maya were acting under color of state law in their official capacities as Commissioners of the New York State Liquor Authority, including in their administration of the liquor licensing process and enforcement of the Alcoholic Beverage Control Law.

90.     In reviewing the Nation's license application, Defendants relied on vague and subjective licensing criteria not imposed on similarly situated non-Indian applicants. Their scrutiny of the Nation was marked by repeated demands for in-person attendance by Nation leadership, despite the geographic remoteness and sovereign status of the Nation. These demands were not only burdensome but also contradictory, at times merely encouraging appearance, at other times declaring it mandatory, later suggesting it was unnecessary, and then again insisting on personal attendance.

91.     Most notably, Defendants expressed baseless concerns that the Nation would fail to comply with New York's alcohol laws and SLA regulations. Chairperson Fan speculated about "who was trafficking the alcohol," questioned whether the Nation would follow SLA rules, and claimed she could not "get comfort that there's appropriate fitness and character here"—notwithstanding the fact that the Nation already holds two active SLA-issued beer licenses for separate Nation-owned establishments, each of which remains in good standing with no violations or compliance concerns. Defendants' suspicion that the Nation would not comply with applicable law was entirely unsupported by the record and appears to reflect discriminatory and pre-conceived notions about Native nations and alcohol regulation, rather than any legitimate regulatory concern.

92.     Further, at the August 6, 2025, hearing, Defendants suggested that the Nation was incapable of adequately policing or enforcing prohibitions on underage drinking, noting that "the state also has very limited enforcement power on the land so… once it's in your hands it's sort of in your hands." This line of questioning singled out the Nation's sovereignty as a basis to cast doubt on its regulatory fitness, even though the Nation presented uncontroverted evidence of its security protocols, police department oversight, and a flawless compliance record under existing SLA beer licenses. Such concerns were not raised against non-Indian applicants, and instead reflect a discriminatory presumption that the Nation's sovereign authority renders it incapable of complying with New York's alcohol laws.

93.     In addition, Defendants repeatedly adjourned the Nation's application without explanation, forcing unnecessary delays in the licensing process and obstructing the Nation's ability to obtain a timely determination. These repeated adjournments, applied selectively against the Nation and without justification, further demonstrate that Defendants' actions were motivated by discriminatory assumptions.

94.     Upon information and belief, Defendants' actions were undertaken intentionally, or with deliberate indifference to the Nation's rights, and have resulted in the effective denial or obstruction of a valid license application, the impairment of the Nation's economic interests, and unlawful discrimination under the Equal Protection Clause.

95.     The Nation reasonably anticipates that any future license applications submitted by the Nation or its entities will be subject to the same discriminatory and unlawful licensing regime, unless enjoined by this Court.

96.     Accordingly, Plaintiffs are entitled to declaratory and injunctive relief under 42 U.S.C. § 1983 to prevent further violations of its constitutional rights and to ensure that its applications are evaluated on equal terms with those of similarly situated non-Indian applicants.

### THIRD CAUSE OF ACTION
**(Violation of 42 U.S.C. § 1981)**
**(Against all defendants)**

97.     Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs as if fully set forth herein.

98.     42 U.S.C. § 1981 guarantees that all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens. It further prohibits subjecting persons to unequal "punishment, pains, penalties, taxes, licenses, and exactions of every kind."

99.     The SLA's liquor licensing regime constitutes a state-administered process by which individuals and entities enter into a regulatory and commercial relationship with the State of New York to sell alcoholic beverages. This regime governs the terms and conditions under which the licensee may operate, and approval by the SLA is a necessary prerequisite to engaging in this commercial activity.

100.    The Nation, through Lakeside, sought to enter into such a relationship by applying for a liquor license from the SLA to operate a retail liquor store on its Reservation. This application constituted an effort to "make and enforce" a business relationship recognized under § 1981.

101.    Defendants interfered with the Nation's ability to complete that licensing process by delaying action, imposing unnecessary procedural requirements, and ultimately signaling a potential denial based on vague concerns unrelated to the statutory criteria.

102.   In doing so, Defendants imposed burdens on the Nation that were not imposed on similarly situated white or non-Indian applicants. These included demands for in-person appearances by Nation principals, excessive scrutiny of zoning concerns, reliance on opposition rooted in objections from incumbent non-Indian licensees, and repeatedly adjourning the Nation's application without justification.

103.   Upon information and belief, this differential treatment was motivated, in whole or in part, by racial animus or discriminatory intent targeting the Nation on the basis of race, ethnicity, ancestry, and Indian status.

104.   By obstructing the Nation's ability to enter into the same contractual or licensing relationship available to non-Indian applicants, Defendants have violated the Nation's rights under 42 U.S.C. § 1981.

105.   As a direct and proximate result of Defendants' discriminatory conduct, the Nation has been deprived of equal participation in the State's liquor licensing regime and effectively denied the opportunity to operate a liquor store on its own territory on equal footing with non-Indian businesses.

106.   Plaintiffs are therefore entitled to declaratory and injunctive relief to remedy this unlawful interference with its contractual rights and to prevent further discrimination.

**FOURTH CAUSE OF ACTION**
**(Violation of 42 U.S.C. § 1985)**
**(Against Defendants Fan, De Leon, and Maya)**

107.   Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs as if fully set forth herein.

108.   42 U.S.C. § 1985(3) prohibits conspiracies by two or more persons to deprive any person or class of persons of the equal protection of the laws or of equal privileges and immunities

under the law, where such conspiracies are motivated by discriminatory animus based on race or protected class status.

109.     At all relevant times, Defendants Fan, De Leon, and Maya were acting under color of state law as Commissioners of the SLA, with the authority to vote on, approve, or deny liquor license applications.

110.     Upon information and belief, Defendants knowingly agreed and conspired among themselves to obstruct, delay, and ultimately deny the Nation's application for a liquor license on discriminatory and pretextual grounds.

111.     This agreement included shared discussions, coordinated actions, and mutually reinforcing decisions—such as jointly demanding a personal appearance from a Nation principal despite no statutory requirement, repeatedly adjourning the Nation's application without justification, deferring or withholding votes, and applying vague and subjective criteria in a way that protected non-Indian competitors.

112.     The purpose and effect of this conspiracy was to deprive the Nation of the equal protection of the laws and to prevent the Nation from exercising its right, on equal terms, to participate in New York's liquor licensing process.

113.     As a direct and foreseeable result of Defendants' unlawful conspiracy, the Nation has been denied equal access to a license it is otherwise qualified to receive, and its sovereign right to operate a liquor store within its own Reservation has been injured.

114.     Plaintiffs are therefore entitled to declaratory and injunctive relief, as well as any other appropriate relief under 42 U.S.C. § 1985.

**FIFTH CAUSE OF ACTION**
**(Violation of Article I, § 11 of the New York Constitution)**
**(Against all defendants)**

115.    Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs as if fully set forth herein.

116.    Article I, § 11 of the New York Constitution guarantees that no person shall be denied the equal protection of the laws of New York state or any subdivision thereof, and prohibits any discrimination in civil rights on the basis of race, color, creed, or religion, by the state or any agency thereof.

117.    As a sovereign Indian nation, the Cayuga Nation is entitled to the protections of Article I, § 11, including the right to be free from discrimination by the State and its agencies based on race, national origin, or Indian status.

118.    Defendants have imposed heightened, inconsistent, and arbitrary standards on the Nation's liquor license application—standards not applied to similarly situated non-Indian applicants.

119.    Defendants have selectively invoked vague criteria to withhold or delay action on the Nation's application and demanded procedural requirements, such as the personal appearance of a Nation principal, that are not imposed on non-Indian applicants.

120.    These actions reflect discriminatory and preconceived assumptions about the Nation's fitness to engage in lawful alcohol sales, despite the Nation's unblemished record operating two SLA-licensed beer establishments. Upon information and belief, defendants' conduct was motivated, at least in part, by bias against the Nation's Indian status and by a desire to protect non-Indian businesses from fair competition.

121.    As a direct and proximate result of Defendants' conduct, the Nation has been denied equal treatment under the law and suffered a deprivation of its rights under the New York Constitution.

122.    Plaintiffs are therefore entitled to declaratory and injunctive relief pursuant to Article I, § 11 of the New York Constitution, as well as all other relief deemed appropriate by this Court.

### SIXTH CAUSE OF ACTION
### (Violation of New York Executive Law § 296)
### (Against Defendant SLA)

123.    Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs as if fully set forth herein.

124.    Section 296(1)(a) of the New York Executive Law makes it an unlawful discriminatory practice for a licensing agency to discriminate against any individual, or entity associated with such individuals, based on race, national origin, citizenship status, or related protected characteristics.

125.    The SLA is a licensing agency within the meaning of the statute and is subject to its requirements.

126.    Lakeside is a wholly owned business of the Cayuga Nation, a federally recognized Indian nation whose members are Native people of distinct national origin and political status.

127.    In evaluating the Nation's liquor license application, the SLA imposed additional procedural burdens not typically applied to similarly situated non-Indian applicants. These included repeated demands for in-person appearances by Nation leaders, reliance on speculative concerns raised by non-Nation competitors, and a vague application of the "public convenience and advantage" standard untethered from any objective criteria.

128.    The SLA's treatment of the Nation's application reflects a discriminatory belief, unsupported by evidence, that the Nation would not comply with state law. This belief stands in

direct contrast to the Nation's proven record of operating two SLA-licensed beer establishments without incident or regulatory concern.

129.    The SLA's disparate treatment of the Nation's application was motivated, at least in part, by discriminatory bias based on race, national origin, or cultural identity, and it reflects unequal treatment in the terms and conditions of a license application within the meaning of Executive Law § 296.

130.    As a direct and proximate result of the SLA's unlawful conduct, the Nation has suffered economic injury and interference with their ability to engage in lawful business operations.

131.    Plaintiffs are therefore entitled to injunctive and declaratory relief, as well as any other remedies available under the New York Human Rights Law.

## SEVENTH CAUSE OF ACTION
### (Declaratory and Injunctive Relief)

132.    Plaintiffs repeat and re-allege the allegations contained in all preceding paragraphs as if fully set forth herein.

133.    An actual and immediate controversy exists between the Nation and Defendants concerning the legality of the State Liquor Authority's actions in discriminatorily denying or obstructing the issuance of a liquor license to a federally recognized Indian nation, contrary to 18 U.S.C. § 1161, the Equal Protection Clause, and other federal and state laws.

134.    Plaintiffs are entitled to a declaratory judgment that: (a) 18 U.S.C. § 1161 establishes a framework for cooperative regulation of alcohol sales in Indian country, and does not authorize the SLA to deny a license on discriminatory, arbitrary, or burdensome grounds; (b) the SLA's imposition of vague and subjective criteria violates the Nation's rights under federal law; (c) the effective denial or obstruction of a license based on the Nation's status as an Indian nation is unlawful, discriminatory, and preempted; and (d) the Nation's federally approved alcohol

ordinance, together with its license application, satisfies the conformity requirements of § 1161 and should be approved without delay.

135.    Plaintiffs are further entitled to injunctive relief: (a) enjoining Defendants from denying or conditioning the license based on discriminatory or unauthorized criteria; (b) prohibiting Defendants from treating the Nation's application less favorably than those of similarly situated non-Indian applicants; and (c) directing Defendants to promptly process and approve the Nation's application in a manner consistent with federal law and the constitutional guarantees of equal protection.

## RELIEF REQUESTED

**WHEREFORE**, in accordance with the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and the general principles of equity, the Nation respectfully seeks:

A.  A declaration that Defendants are currently violating 18 U.S.C. § 1161 and the Equal Protection Clause of the Fourteenth Amendment by effectively denying the Cayuga Nation's liquor license application despite compliance with applicable law;

B.  A declaration that Defendants are unlawfully treating the Cayuga Nation less favorably than similarly situated non-Indian applicants in violation of 42 U.S.C. § 1983;

C.  A declaration that Defendants' effective denial of the Nation's license application was based on arbitrary, pretextual, or unequally applied standards that violate federal and state law;

D.  An injunction directing Defendants to cease applying discriminatory, arbitrary, or heightened standards to the Cayuga Nation's liquor license application;

E.  An injunction prohibiting Defendants from conditioning licensure on vague or pretextual requirements that disproportionately burden the Nation or its citizens;

F.  An injunction requiring Defendants to process and review the Cayuga Nation's liquor license application on equal terms with similarly situated non-Indian applicants, in a non-discriminatory and constitutionally compliant manner;

G.  An order directing Defendants to comply with 18 U.S.C. § 1161 and to act within the ministerial scope of authority contemplated by that statute when reviewing future license applications submitted by the Nation or its entities;

H.  All costs, attorneys' fees, and other expenses allowed by law; and

I.  Such other and further relief as the Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to the Federal Rules of Civil Procedure 38(b), the Nation respectfully demands a trial by jury of all issues triable by a jury.

Dated: September 17, 2025

**BARCLAY DAMON LLP**

By: ___*/s/ David G. Burch, Jr.*___
David G. Burch, Jr.
Jennifer J. Hopkins

125 East Jefferson Avenue
Syracuse, New York 13202
Tel: (315) 425-2788
dburch@barclaydamon.com
jhopkins@barclaydamon.com

*Attorneys for Plaintiffs Cayuga Nation and Lakeside Enterprises, Inc.*