**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

CAYUGA NATION, a federally recognized Indian Nation, and LAKESIDE ENTERPRISES, INC.,

Plaintiffs,

5:25-cv-01312 (BKS/ML)

v.

NEW YORK STATE LIQUOR AUTHORITY; LILY FAN, in her official capacity as the Chair and Commissioner of the New York State Liquor Authority; EDGAR DE LEON, in his official capacity as a Commissioner of the New York State Liquor Authority; and JOHN MAYA, in his official capacity as a Commissioner of the New York State Liquor Authority,

Defendants.

---

**Appearances:**

*For Plaintiffs:*
David G. Burch, Jr.
Jennifer J. Hopkins
Barclay Damon LLP
Barclay Damon Tower
125 East Jefferson Street
Syracuse, New York 13202

*For Defendants:*
Letitia James
Attorney General of the State of New York
Aimee Cowan
Assistant Attorney General
300 South State Street, Suite 300
Syracuse, New York 13202

*For Proposed Amicus Curiae:*
Michael D. Sliger
Joseph J. Heath
Law Offices of Michael D. Sliger, Esq.
1177 Avenue of the Americas, 5th Floor
New York, New York 10036

**Hon. Brenda K. Sannes, Chief United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

Plaintiffs, the Cayuga Nation and Lakeside Enterprises, Inc., bring this action asserting claims under state and federal law, stemming from Defendants' denial of their liquor license application. (Dkt. No. 16). Defendants are the New York State Liquor Authority, as well as its three commissioners, Lily Fan, Edgar De Leon, and John Maya. Presently before the Court is Defendants' motion to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), as well as a motion for leave to submit an amicus curiae brief filed by the Traditional Chiefs and Clan Mothers of the Cayuga Nation. (Dkt. Nos. 17, 28). The motions are fully briefed. (Dkt. Nos. 17-1, 20, 26, 28-1, 30, 32, 33). For the reasons that follow, Proposed Amicus's motion is denied, and Defendants' motion is granted in part and denied in part.

## II. BACKGROUND

### A. Statutory Framework

"'Congress has divested [native tribes] of any inherent power to regulate' the use of and distribution of alcoholic beverages in Indian country." *Flandreau Santee Sioux Tribe v. Noem*, 938 F.3d 928, 937 (8th Cir. 2019) (quoting *Rice v. Rehner*, 463 U.S. 713, 724 (1983)). Today, federal law generally prohibits the sale of intoxicating liquors within such jurisdictions. *See* 18 U.S.C. § 1154(a). But Congress created an exception to this general rule in 18 U.S.C. § 1161, which provides:

> The provisions of sections 1154, 1156, 3113, 3488, and 3669, of this title, shall not apply within any area that is not Indian country, nor to any act or transaction within any area of Indian country provided such act or transaction is in conformity both with the laws of the State in which such act or transaction occurs and with an ordinance duly adopted by the tribe having jurisdiction over such area of Indian

> country, certified by the Secretary of the Interior, and published in the Federal Register.

In doing so, it "delegated authority to the States as well as to . . . tribes to regulate the use and distribution of alcoholic beverages in Indian country." *City of Timber Lake v. Cheyenne River Sioux Tribe*, 10 F.3d 554, 556 (8th Cir. 1993) (*quoting Rehner*, 463 U.S. at 715); *see also Furry v. Miccosukee Tribe of Indians of Fla.*, 685 F.3d 1224, 1231 (11th Cir. 2012).

New York's Alcoholic Beverage Control Law, in turn, prohibits the retail sale of "any alcoholic beverage within the state" by any person "without obtaining the appropriate license." N.Y. Alco. Bev. Cont. Law ("ABCL") § 100(1). Such licenses are issued by the New York State Liquor Authority. *See id.* § 17(1). As now relevant, the Authority's determination whether to issue a license "shall be made in accordance with public convenience and advantage." *Id.* § 63(6); *see also id.* § 2. The New York legislature "empower[ed]" the Authority to make this determination to "carr[y] out" state policy related to the sale of alcoholic beverages. *See id.* § 2. That policy, the legislature in relevant part explained, seeks to promote "the health, welfare and safety of the people of the state"; foster "temperance in the consumption of alcoholic beverages"; "and, to the extent possible, support[] economic growth, job development, and the state's alcoholic beverage production industries and its tourism and recreation industry." *See id.*

**B. Facts**[1]

The Nation "is a federally recognized Indian nation," and Lakeside is a "wholly owned business" of the Nation, "organized and operated under the Nation's laws." (Dkt. No. 16, at 3). The Nation's federally recognized reservation spans 64,015 acres across Cayuga County and Seneca County. (*See id.* at 6–8). In 2021, the Nation enacted an alcoholic beverage control

---

[1] The facts are drawn from the operative second amended complaint and the documents attached to it. (Dkt. No. 16). The Court assumes the truth of, and draws all reasonable inferences from, the well-pleaded factual allegations. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).

ordinance to govern the manufacture, distribution, and sale of alcoholic beverages on Nation lands. (*Id.* at 8; *see also* Dkt. No. 16-1, 2–4 (copy of ordinance published in Federal Register)). Since then, "the Nation successfully obtained and has continuously maintained two on-premises beer licenses" from the Authority for "separate Nation-owned establishments on its [r]eservation." (Dkt. No. 16, at 8). These licenses remain in good standing. (*Id.* at 2, 8, 24).

In September 2024, Lakeside submitted an application to the Authority seeking a license "to sell alcoholic beverages at a planned convenience store and gas station located on the Nation's [r]eservation." (*Id.* at 9). The application "confirmed [Lakeside's] intention to comply with both" the Nation's ordinance and "all generally applicable provisions of New York law." (*Id.*). The Authority made multiple requests for clarification and additional information, to which Lakeside and the Nation responded. (*See id.* at 9–10).

Eventually, the Authority notified Plaintiffs that Lakeside's application would be reviewed by the full board at a May 2025 meeting. (*Id.* at 10). The notification "letter stated: 'If you are the applicant, you are *strongly encouraged* to appear to be heard in support of your case.'" (*Id.*). Before the May meeting, Plaintiffs' counsel "discovered that" two "local competitors" had submitted protest letters "in opposition to the application." (*Id.* at 11). The letters "objected to [Plaintiffs'] application on economic grounds"—arguing that granting the license would oversaturate the market and "create an uneven playing field," as Lakeside would "sell liquor at lower prices by avoiding New York sales tax and purchasing products outside the state's distribution system." (*See id.*).

Plaintiffs' counsel appeared before the full board at the May 2025 meeting. (*Id.* at 11). The Nation's "principal," however, "was unable to attend" because of "prior commitments and the significant travel burden" from the Finger Lakes to New York City. (*Id.* at 11–12). Counsel

"was fully prepared to address" questions, but the full board—consisting of Defendants Fan, De Leon, and Maya—"expressed visible dissatisfaction with the absence of a Nation principal." (*See id.* at 12). It therefore deferred considering Plaintiffs' application until a June 2025 meeting, at which it required a Nation representative to "appear in person to speak to 'public convenience and advantage.'" (*Id.*).

Plaintiffs' counsel appeared at the June meeting, again without a Nation representative, who "was unable to attend due to scheduling conflicts." (*See id.* at 12–13). The board denied Plaintiffs' application. (*Id.* at 13). Fan "expressed concerns that the Nation would not abide by [Authority] rules and regulations, raised unspecified 'public safety concerns,' and questioned 'who was trafficking the alcohol.'" (*Id.*). She also "remarked that she could not 'assess the fitness and character' of the applicant without a personal appearance"; Maya expressed similar concerns. (*Id.*). The Authority issued a preliminary notice of disapproval several days later. (*Id.*).

Plaintiff requested reconsideration. (*Id.*). The board considered this request at a hearing the following August, at which the Nation's chief operating officer ("COO") appeared. (*Id.* at 13–15). It "heard argument from counsel and testimony from [the COO] concerning the Nation's alcohol regulatory ordinance, prior history of compliance with [Authority] beer licenses, security protocols, and the Nation's commitment to responsible alcohol sales." (*Id.* at 14–15).

During the hearing, Plaintiffs say, the board "made a series of disparaging and dismissive remarks," "reflecting an attitude of hostility and bias toward the Nation's application." (*Id.* at 15). They also "expressed concerns that the Nation would be unable to adequately enforce laws prohibiting underage drinking." (*Id.*). After additional questioning, the board stated "that it would not reach a final determination that day," adjourning the matter to a subsequent meeting

later that month. (*Id.*). It "expressly instructed that neither [the COO] nor any Nation representative needed to appear at the adjourned hearing." (*Id.*).

After a series of unexplained adjournments and delays, the board again considered Plaintiffs' application during a late October 2025 meeting. (*See id.* at 16–18). Despite its prior instruction, in mid-September, the board requested that a Nation representative again appear at the October meeting. (*Id.* at 16). Counsel, however, appeared alone, "consistent with [the Authority's] prior directions." (*See id.* at 18). The board "questioned counsel about the Nation's decision not to appear, treating the absence of a representative as a negative factor." (*Id.* at 18–19). It also focused on "issues unrelated to any statutory licensing criteria, such as the Nation's sovereign status, its exemption from state sales-tax registration, its decision to not 'commit' to selling a fixed percentage of New York-made products, and its refusal to stipulate that the licensed premises would 'forever' remain limited to" a specific size. (*Id.* at 19–20).

Each board member voted to deny the application. (*See id.* at 20). Commissioner De Leon stated "that he could not find 'public convenience and advantage based on [declining alcohol] sales'" in the region, and because Plaintiff did not plan to offer products or experiences distinguishable from the already-existing liquor stores. (*See id.*). Maya likewise reasoned "that the proposed store offered 'no public convenience and advantage,' citing the proximity of other stores." (*Id.*). Chair Fan agreed that there existed no "public convenience and advantage." (*Id.*). "She emphasized that the applicant had no 'distinguishable business plan,' offered 'no education or tastings,' and declined to send a representative to the hearing"; she "further cited the Nation's inability to 'commit to not going bigger,' flat or declining sales at nearby stores, statewide decreases in alcohol consumption, lack of population growth, and [the] absence of investment in New York manufacturers." (*Id.* at 20–21).

The Authority later issued a written decision memorializing much of the reasoning described above. (*Id.* at 22; *see also* Dkt. No. 16-36). The proposed store, the Authority explained, did "not offer anything unique, *i.e.* educational offering, tastings or unique products, that would distinguish it from the existing stores" in the vicinity. (Dkt. No. 16-36, at 4). Moreover, although located in the Finger Lakes region, "counsel stated that the store would not necessarily sell any of the wines of the region, or any other alcoholic beverages manufactured in New York State and would not commit to selling a specific p[er]cent of New York State [p]roducts." (*Id.*). For all these reasons, Plaintiffs failed to "demonstrate that granting [their] application would serve the public convenience and advantage"—especially given the "proximity of the closest stores and their stagnant or declining sales," confirming the lack of "demand or need for an additional liquor store in the geographic area." (*Id.*).

## III. MOTION FOR LEAVE TO FILE AMICUS CURIAE BRIEF

Preliminarily, the Court considers the motion for leave to file an amicus curiae brief filed by Proposed Amicus the Traditional Cayuga Nation Chiefs and Clan Mothers. (Dkt. No. 28). Proposed Amicus, which has been "embroiled in a longstanding leadership dispute" with the Nation, generally asserts that it can provide a unique perspective regarding the role of alcohol in the Nation's tradition. (*See generally* Dkt. No. 28-1). Defendants take no position on the motion. (Dkt. No. 30, at 1). Plaintiffs oppose it, arguing that it is untimely and not useful to the Court. (*See generally* Dkt. No. 32).

"[D]istrict courts have broad discretion to permit or deny the appearance of amici curiae in a given case." *Soos v. Cuomo*, 470 F. Supp. 3d 268, 284 (N.D.N.Y. 2020) (citation modified). "The usual rationale for *amicus curiae* submissions is that they are of aid to the court and offer insights not available from the parties." *United States v. El-Gabrowny*, 844 F. Supp. 955, 957 n.1 (S.D.N.Y. 1994); *Soos*, 470 F. Supp. 3d at 284. Local Rule 7.2(c) provides that motions for leave

to file an amicus brief must be filed "no later than 7 days after the principal brief of the party being supported is filed unless the amicus curiae makes a showing of good cause as to why the motion could not have been filed within said 7 days."

Here, Defendants moved to dismiss the operative complaint on December 17, 2025. (*See* Dkt. No. 17). Proposed Amicus, however, failed to file its motion until March 4, 2026—seven days after Defendants filed their reply. (*See* Dkt. Nos. 26, 28). Proposed Amicus argues that it has satisfied Local Rule 7.2(c)'s "good cause" requirement because its brief is helpful, and because "its own internal mechanisms and process of consensus, by its nature, takes time." (Dkt. No. 28-1, at 22; *see also* Dkt. No. 33, at 5–7).

The proposed amicus brief, however, discusses several matters not relevant to the below legal analysis. (*See* Dkt. No. 28-17, at 8–9, 10, 11–12, 15, 16–17). It also refers to numerous facts outside the complaint, which the Court generally cannot consider at this stage. *See, e.g.*, *Pearson v. Gesner*, 125 F.4th 400, 406 (2d Cir. 2025). So even were the good cause requirement met, the Court in its discretion denies Proposed Amicus's motion. Given the parties' thorough treatment of the issues and the proposed brief's contents, "the need for an amicus curiae is minimal to non-existent." *See Soos*, 470 F. Supp. 3d at 284. Proposed Amicus is advised that, in the event it seeks to participate in future actions as amicus curiae, any proposed brief should be properly tailored to the issues before the Court. *See id.* (discussing circumstances in which leave to file amicus brief should be denied); *cf.* L.R. 7.2(b) (requiring proposed amici to "set forth . . . why the matters asserted are relevant to the disposition of the case").

## IV. MOTION TO DISMISS

### A. Standard of Review

"A court faced with a motion to dismiss pursuant to both Rules 12(b)(1) and 12(b)(6) must decide the jurisdictional question first because a disposition of a Rule 12(b)(6) motion is a

decision on the merits and, therefore, an exercise of jurisdiction." *Magee v. Nassau Cnty. Med. Ctr.*, 27 F. Supp. 2d 154, 158 (E.D.N.Y. 1998) (citing *Rhulen Agency, Inc. v. Ala. Ins. Guar. Ass'n*, 896 F.2d 674, 678 (2d Cir. 1990)). "In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014).

To survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Mere "labels and conclusions" are insufficient; rather, a plaintiff must provide factual allegations sufficient "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The Court must "accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *E.E.O.C. v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). Additionally, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

**B. Sovereign Immunity**

Defendants first argue that several of Plaintiffs' claims are barred by the Eleventh Amendment and sovereign immunity. (*See* Dkt. No. 17-1, at 32–39, 41–42, 44–48; Dkt. No. 26, at 8–12, 14–16). Plaintiffs disagree. (*See* Dkt. No. 20, at 26–29, 32–33, 37–38, 41–44).

"[T]he Supreme Court has interpreted the Eleventh Amendment to extend to suits by all persons against a state in federal court." *T.W. v. N.Y. State Bd. of L. Exam'rs*, 110 F.4th 71, 79 (2d Cir. 2024) (quoting *Mancuso v. N.Y. State Thruway Auth.*, 86 F.3d 289, 292 (2d Cir. 1996));

*Allen v. Cooper*, 589 U.S. 248, 254–55 (2020). States are accordingly "immune from suit under the terms of the Eleventh Amendment and the doctrine of sovereign immunity." *Unkechaug Indian Nation v. Seggos*, 126 F.4th 822, 829 (2d Cir. 2025) (quoting *Whole Woman's Health v. Jackson*, 595 U.S. 30, 39 (2021)). Sovereign immunity "extends beyond the states themselves to 'state agents and state instrumentalities' that are, effectively, arms of a state." *Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006) (quoting *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997)). "[S]uits against state officers acting in their official capacities are 'no different from a suit against the State itself.'" *Chris H. v. New York*, 764 F. App'x 53, 55 (2d Cir. 2019) (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989)). Immunity applies "regardless of the nature of the relief sought." *See 74 Pinehurst LLC v. New York*, 59 F.4th 557, 570 (2d Cir. 2023) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984)); *see also Pennhurst*, 465 U.S. at 101–02 ("[A]s when the State itself is named as the defendant, a suit against state officials that is in fact a suit against a State is barred regardless of whether it seeks damages or injunctive relief."). And it applies to "suits brought by Native American tribes." *Seggos*, 126 F.4th at 829 (citing *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 269 (1997)).

Certain exceptions to this immunity exist, however. "A State may waive its sovereign immunity at its pleasure, and in some circumstances Congress may abrogate it by appropriate legislation." *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 253–54 (2011) (citation omitted). Additionally, in *Ex parte Young*, 209 U.S. 123 (1908), the Supreme Court "held that the Eleventh Amendment does not prevent federal courts from granting prospective injunctive relief" against state officials "to prevent a continuing violation of federal law." *See Ward v. Thomas*, 207 F.3d 114, 119 (2d Cir. 2000) (quoting *Green v. Mansour*, 474 U.S. 64, 68 (1985));

*Silva v. Farrish*, 47 F.4th 78, 84 (2d Cir. 2022). This final exception "has no application" to states or their agencies. *Silva*, 47 F.4th at 84; *Seggos*, 126 F.4th at 829.

Defendants here seek dismissal of Plaintiffs' 18 U.S.C. § 1161 and 42 U.S.C. §§ 1981, 1983, and 1985 claims, as well as Plaintiffs' state law claims, as barred by sovereign immunity.[2] (*See* Dkt. No. 17-1, at 32, 37, 41, 44, 45, 47). All the individual Defendants are sued in their official capacities only, (Dkt. No. 16, at 3), and Plaintiffs do not dispute that the Authority is an arm of the state. *See Gollomp v. Spitzer*, 568 F.3d 355, 366 (2d Cir. 2009) (state agencies constitute arms of the state); *see also Cloister E., Inc. v. N.Y. State Liquor Auth.*, 563 F. Supp. 3d 90, 102 (S.D.N.Y. 2021) ("[T]he Eleventh Amendment applies to claims against state agencies such as the [state liquor authority]."). Nor do they contest Defendants' assertion that New York has not waived, and Congress has not abrogated, New York's immunity as to the above claims. *See Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 672, 675–76 (1999) (discussing generally circumstances under which states may waive, and Congress may abrogate, sovereign immunity).[3]

Accordingly, the Court need only determine whether the *Ex parte Young* exception applies to those claims. Because that exception has no applicability to state agencies, all such claims against the Authority must be dismissed without prejudice. *See Katz v. Donna Karan Co.*,

---

[2] The Court's analysis does not address Plaintiffs' Commerce Clause claim as to which Defendants have not invoked sovereign immunity. *Cf. Wis. Dep't of Corr. v. Schacht*, 524 U.S. 381, 389 (1998) ("Unless the State raises [sovereign immunity], a court can ignore it.").

[3] *See also Hahn v. New York*, 825 F. App'x 53, 54 (2d Cir. 2020) (New York has not waived, nor has Congress abrogated, sovereign immunity as to § 1983 claims); *Dimps v. Taconic Corr. Facility*, 802 F. App'x 601, 603 (2d Cir. 2020) (same as to § 1981); *Murawski v. N.Y. State Bd. of Elections*, 285 F. Supp. 3d 691, 696 (S.D.N.Y. 2018) (same as to § 1985); *Baez v. N.Y. State Off. of Temp. & Disability Assistance*, No. 25-1092, 2026 WL 1412962, at *5, 2026 U.S. App. LEXIS 14355, at *10–11 (2d Cir. May 20, 2026) (same as to N.Y. Exec. L. § 296); *Sutter v. Dibello*, No. CV 18-817, 2019 WL 4195303, at *6, 2019 U.S. Dist. LEXIS 136665, at *18 (E.D.N.Y. Aug. 12, 2019) (same as to N.Y. Const. art. I, § 11), *report-recommendation adopted*, 2019 WL 4193431, at *1–2, 2019 U.S. Dist. LEXIS 150417, at *3–4 (E.D.N.Y. Sept. 4, 2019).

872 F.3d 114, 121 (2d Cir. 2017); *Karupaiyan v. New York*, No. 23-1257, 2024 WL 2174272, at *2, 2024 U.S. App. LEXIS 11740, at *4–5 (2d Cir. May 15, 2024). The Court addresses below Plaintiffs' remaining official-capacity claims against the individual Defendants.

### 1. Federal Law Claims

"In determining whether the *Ex parte Young* doctrine applies," courts "need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Seggos*, 126 F.4th at 829 (citation modified); *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002); *T.W.*, 110 F.4th at 91. "In doing so," they "look to the substance rather than to the form of the relief sought." *Vega v. Semple*, 963 F.3d 259, 282 (2d Cir. 2020) (citing *Edelman v. Jordan*, 415 U.S. 651, 668 (1974)). "[R]elief that is 'tantamount to an award of damages for a past violation of federal law, even though styled as something else,' is barred." *Id.* (quoting *Papasan v. Allain*, 478 U.S. 265, 278 (1986)); *Seneca Nation v. Hochul*, 58 F.4th 664, 671–72 (2d Cir. 2023). But "relief that serves directly to bring an end to a present violation of federal law is not barred by the Eleventh Amendment," even if "accompanied by [an] ancillary effect on the state treasury." *Vega*, 963 F.3d at 282 (quoting *Papasan*, 478 U.S. at 278).

Turning first to Plaintiffs' § 1161 claims, they are not barred by sovereign immunity. Plaintiffs assert that "Defendants have applied a discretionary and one-sided licensing regime to the Nation's liquor license application that exceeds the authority contemplated under § 1161." (Dkt. No. 16, at 22). Specifically, they argue that Defendants' "reliance on the [ABCL's] 'public convenience and advantage' standard was improper," as that standard "is preempted both by federal law and the Nation's sovereign authority." (*Id.* at 21). As a result, Plaintiffs seek "declaratory and injunctive relief to prevent further violations of their rights under federal law." (*Id.* at 23).

In short, Plaintiffs "allege that the enforcement of state [alcohol] regulations violates their federally protected" right to sell alcohol under § 1161.[4] *Silva*, 47 F.4th at 84. Their "requested [injunctive] relief—that [Defendants] be enjoined from enforcing the [ABCL's public convenience and advantage standard] against them—would prospectively end the alleged violation." *Id.* Plaintiffs' request for "forward-looking" declaratory relief "adds nothing to the prayer for injunction" and "does not impose upon the State a monetary loss resulting from a past breach of a legal duty on the part of the defendant state officials." *Seggos*, 126 F.4th at 829 n.11 (emphasis omitted) (quoting *Verizon Md.*, 535 U.S. at 646). So "*Ex parte Young* applies." *Silva*, 47 F.4th at 84; *Seggos*, 126 F.4th at 829.

Plaintiffs' §§ 1981, 1983, and 1985 claims, however, do not challenge ongoing violations of federal law, so they may not proceed. As to § 1981, Plaintiffs allege that their liquor license application "*constituted* an effort to 'make and enforce' a business relationship recognized under" the statute. (Dkt. No. 16, at 26 (emphasis added)). Defendants, they say, "*interfered* with the Nation's ability to complete that licensing process by" engaging in the conduct described above. (*Id.* (emphasis added)). "In doing so," Defendants "*imposed* burdens on the Nation that were not imposed on" others and inflicted "differential treatment [which] *was* motivated . . . by racial animus or discriminatory intent." (*Id.* at 27 (emphasis added)).

Plaintiffs' § 1983 allegations similarly concern Defendants' past conduct in evaluating and denying their application. (*See id.* at 23–25). Specifically, Plaintiffs assert that "Defendants *relied* on vague and subjective licensing criteria not imposed on similarly situated non-Indian applicants"; that "Defendants *expressed* baseless concerns that [Plaintiffs] would fail to comply"

[4] To the extent Plaintiffs' § 1161 claims stem from Defendants' past actions—such as their alleged "series of demands untethered to any statutory criterion," or "serial delay and shifting discretionary demands," (Dkt. No. 20, at 18, 24)—they do not constitute an ongoing violation of federal law and cannot proceed under *Ex parte Young*. *See Seneca Nation*, 58 F.4th at 670.

with state law and regulations; that "Defendants repeatedly *adjourned* [the] application without explanation"; and that "Defendants ultimately *denied* the . . . application on grounds unrelated to any statutory disqualification." (*Id.* at 24–25 (emphasis added)).

Likewise, as to § 1985, Plaintiffs allege that Defendants "*were acting* under color of state law" and "knowingly *agreed* and *conspired* among themselves to obstruct, delay, and ultimately deny" Plaintiffs' application. (*Id.* at 28 (emphasis added); *see also id.* ("This agreement *included* shared discussions, coordinated actions, and mutually reinforcing decisions . . . ." (emphasis added)); *id.* ("The purpose and effect of this conspiracy *was to deprive* the Nation of the equal protection of the laws and [prevent it] from exercising its right . . . to participate in [the] licensing process." (emphasis added))).

Based on the above allegations, none of these claims are "concerned with" any "*ongoing effect* of the" alleged past interference, disparate treatment, or conspiracy, but instead the past interference, disparate treatment, and conspiracy themselves. *See Seneca Nation*, 58 F.4th at 670; *cf. Papasan*, 478 U.S. at 282 (complaint properly alleged ongoing violation where "essence" of equal protection claim was "present disparity," not past wrong that "directly" caused disparity). To be sure, as to § 1983, Plaintiffs also allege that they "reasonably anticipate[] that any future license applications [they submit] will be subject to the same discriminatory and unlawful licensing regime." (Dkt. No. 16, at 25). But as discussed above, Plaintiffs § 1983 claims appear to challenge past disparate treatment, not the licensing regime itself—and that conclusory assertion does not plausibly allege any "continuing violation." *Ward*, 207 F.3d at 119 (quoting *Green*, 474 U.S. at 68).

Plaintiffs therefore do not allege any ongoing violation of federal law, and their §§ 1981, 1983, and 1985 claims concerning only past wrongs must be dismissed without prejudice as

barred by sovereign immunity. *See Seggos*, 126 F.4th at 829; *Katz*, 872 F.3d at 121; *Karupaiyan*, 2024 WL 2174272, at *2, 2024 U.S. App. LEXIS 11740, at *4–5.[5]

**2. State Law Claims**

Plaintiffs' state constitutional and statutory claims are also barred. *Ex parte Young* applies only to prevent state officials from "enforcing state laws that are contrary to *federal law*." *Silva*, 47 F.4th at 84 (emphasis added) (quoting *Jackson*, 595 U.S. at 39); *cf. Pennhurst*, 465 U.S. 106 ("A federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law."). Indeed, "[i]t is well settled that federal courts may not grant declaratory or injunctive relief against a state agency based on violations of state law." *Bad Frog Brewery, Inc. v. N.Y. State Liquor Auth.*, 134 F.3d 87, 93 (2d Cir. 1998) (citing *Pennhurst*, 465 U.S. at 106). "[A] claim that state officials violated state law in carrying out their official responsibilities is a claim against the State" protected by the Eleventh Amendment, even as to "state-law claims brought into federal court under pendent jurisdiction."[6] *Vega*, 963 F.3d at 284 (quoting *Pennhurst*, 465 U.S. at 121).

Resisting this conclusion, Plaintiffs attempt to distinguish *Pennhurst*. They note that allegations underlying the claims there were "very different from the allegations here," which involve "intentional discrimination and coordinated obstruction." (Dkt. No. 20, at 43). But Plaintiffs cite no authority establishing that this distinction makes a difference. As the Supreme Court has explained, "when a plaintiff alleges that a state official has violated *state* law," the

---

[5] Plaintiffs have not sought permission to amend their complaint, and the operative complaint is their second amended complaint. The Court has therefore not considered the issue of amendment. *Cf. Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) ("[T]he contention that the District Court abused its discretion in not permitting an amendment that was never requested is frivolous." (citation modified)).

[6] Plaintiffs do not allege that Defendants acted "without any authority whatever." *Pennhurst*, 465 U.S. at 101 n.11 (quoting *Fla. Dep't of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 697 (1982)). So they cannot escape the Eleventh Amendment's bar "based on a theory that [Defendants] acted beyond the scope of [their] statutory authority." *See Skatemore, Inc. v. Whitmer*, 40 F.4th 727, 736 (6th Cir. 2022) (quoting *Treasure Salvors*, 458 U.S. at 689).

"entire basis for the doctrine of [*Ex parte Young*] disappears." *Pennhurst*, 465 U.S. at 106. This case is no different. So these claims, too, must be dismissed without prejudice. *Katz*, 872 F.3d at 121; *Karupaiyan*, 2024 WL 2174272, at *2, 2024 U.S. App. LEXIS 11740, at *4–5.

**C. 18 U.S.C. § 1161**

As to their § 1161 claims, Plaintiffs assert that Defendants applied a liquor "licensing regime" that "exceeds the [state's] authority contemplated under" that statute. (Dkt. No. 16, at 22; *see* Dkt. No. 20, at 14–26). Defendants argue that § 1161 confers no private right of action, and that the statute "expressly contemplates and authorizes the application of state liquor laws." (*See* Dkt. No. 17-1, at 22–24, 29–32 (emphasis omitted)).

Initially, although Defendants are correct that § 1161 contains no express private right of action, the Supreme Court has "long held that federal courts may in some circumstances grant injunctive relief against state officers who are violating, or planning to violate, federal law." *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015). "The ability to sue" state officers for such conduct "is the creation of courts of equity," and courts may exercise equity jurisdiction "subject to express and implied statutory limitations." *Id.* at 327. "Beyond [such statutory limitations], however, the Supreme Court has done little to define the boundaries, if any, that might circumscribe this 'judge-made remedy.'" *See Fed. Defs. of N.Y., Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 133 (2d Cir. 2020) (quoting *Armstrong*, 575 U.S. at 327). Because the parties' limited briefing on this question has "not meaningfully addressed" equity jurisdiction, the Court declines to dismiss Plaintiffs' § 1161 claims on that ground. *See Cayuga Nation v. N.Y. State Gaming Comm'n*, 775 F. Supp. 3d 651, 665 (N.D.N.Y. 2025); *cf. Flandreau Santee Sioux Tribe v. Gerlach*, 155 F. Supp. 3d 972, 998–1000 (D.S.D. 2015) (denying motion for judgment on the pleadings as to claim, predicated on § 1161, that state improperly "condition[ed] issuance of a liquor license on taxes unrelated to alcohol regulation").

Turning to the merits, although early Supreme Court cases held the "that the laws of a [s]tate can have no force within reservation boundaries," the Court "[l]ong ago departed from" that "view." *See White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 141 (1980) (citation modified). Congress has since largely "opened the doors of reservations to state laws." *Rehner*, 463 U.S. at 718 (quoting *Organized Vill. of Kake v. Egan*, 369 U.S. 60, 74 (1962)). Ordinarily, "[t]he extent of a state's regulatory power turns on the location of," as well as the "participants in," the "targeted conduct." *HCI Distrib., Inc. v. Peterson*, 110 F.4th 1062, 1066 (8th Cir. 2024) (citing *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 769 F.3d 105, 113 (2d Cir. 2014)). "Although in Indian matters, Congress usually acts upon the assumption that the [s]tates have no power to regulate the affairs of Indians on a reservation, that assumption would be unwarranted in the narrow context of the regulation of liquor." *Rehner*, 463 U.S. at 723 (citation modified); *see also Fort Belknap Indian Cmty. of Fort Belknap Indian Rsrv. v. Mazurek*, 43 F.3d 428, 433 (9th Cir. 1994).

"[T]radition simply has not recognized a sovereign immunity or inherent authority in favor of liquor regulation by" native tribes. *Rehner*, 463 U.S. at 722; *Mazurek*, 43 F.3d at 433. Instead, there exists a "tradition of concurrent state and federal jurisdiction over the use and distribution of alcoholic beverages in Indian country." *See Rehner*, 463 U.S. at 722–24. That tradition of concurrent jurisdiction "is justified by the relevant state interests involved." *Id.* at 724. Liquor distribution "has a significant impact beyond the limits of" a reservation; liquor sold to "tribal members or to non-members can easily find its way out of the reservation and into the hands of whom, for whatever reason, the [s]tate does not wish to possess alcoholic beverages, or to possess them through a [means] over which the [s]tate has no control." *See id.*

Within this historical tradition, as explained above, § 1161 exempts from the federal prohibition on liquors sales in "Indian Country" any "act or transaction [which] is in conformity with the laws of the State in which such act or transaction occurs," and with a "duly adopted," certified, and published tribal ordinance. Congress, the Supreme Court explained in *Rehner*, enacted § 1161 to abolish the discriminatory federal prohibition, and "to delegate a portion of its authority to the tribes as well as to the States, so as to fill the void." *See Rehner*, 463 U.S. at 728–29, 733. Thus, § 1161 "authorized, rather than pre-empted, state regulation over Indian liquor transactions." *See id.* at 726; *see also Squaxin Island Tribe v. Washington*, 781 F.2d 715, 719 (9th Cir. 1986); *Peterson*, 110 F.4th at 1068.

Plaintiffs here "do not dispute that [§] 1161 permits [s]tates to apply generally applicable liquor standards in Indian country." (Dkt. No. 20, at 17). Rather, they assert that "Defendants imposed a discretionary, one-sided licensing regime"—the public convenience and advantage standard—"that exceeds the scope of authority Congress contemplated in [§] 1161 and unlawfully obstructs alcohol sales otherwise authorized under federal law." (*See id.*; *see also id.* at 14 (arguing that state "may not wield licensing discretion in a manner that nullifies a federally approved tribal ordinance or renders Nation authorization meaningless")). "While *Rehner* held that [§] 1161 permits [s]tates to require Nation sellers to comply with state liquor laws," Plaintiffs say, "it did not hold that [s]tates possess unbounded authority to impose any licensing standard or discretionary criterion they choose." (*Id.* at 20).

In support of these arguments, Plaintiffs point to *Gerlach*, a 2015 decision from the District of South Dakota. (*Id.* at 18–19). That decision explained that although *Rehner* established states' authority to impose liquor licensing requirements on tribes, it did not "contend with the more discrete issue of what conditions may be attached to licensure." *Gerlach*, 155 F.

Supp. 3d at 999. In *Gerlach*, the court considered whether a state could condition issuance of liquor licenses on a tribe's remitting purportedly invalid taxes. *See id.* at 997–98, 999. It explained that the "state's authority to tax in Indian country is operationally curtailed by a tribe's sovereign immunity." *Id.* at 999–1000. So "[i]f a tax on Indian land is invalid," the state cannot then "condition certain powers on payment of those very same invalid taxes." *Id.* at 999. Otherwise, the state could circumvent tribal sovereign immunity by "establish[ing] a statutory scheme superficially connecting" a tax—or any other "subject matter"—with "alcohol regulation." *See id.* Indeed, in all the federal appellate § 1161 decisions the state cited in *Gerlach*, the underlying facts concerned "regulations sharing a nexus with alcohol." *Id.* (collecting cases).

Similarly, in a related case the parties here also cite, the Eighth Circuit considered "whether the [s]tate's remedy for the [t]ribe's failure to collect and remit valid use taxes—non-renewal of its liquor licenses—[was] preempted by federal law." *Noem*, 938 F.3d at 938. There, the state had authority both to regulate liquor on the reservation under § 1161, and to tax non-native purchases of goods and services at the reservation establishment. *Id.* Applying the Supreme Court's *Bracker* balancing test, *see generally Bracker*, 448 U.S. at 136, the court concluded that the plaintiff tribe failed to "demonstrate that that the [s]tate alcohol license requirement [was] not reasonably necessary to further [the state] interest in collecting valid state taxes." *Noem*, 938 F.3d at 938–39.

Neither of these decisions, however, control the outcome here. Plaintiffs take issue with a state regulation that, although discretionary, concerns only liquor licensing, not taxation or any other regulatory area. The Supreme Court noted in *Rehner* that, "[w]ith respect to the regulation of liquor transactions, as opposed to the state income taxation," native tribes "cannot be said to

possess the usual accoutrements of tribal self-government." *Rehner*, 463 U.S. at 724 (citation modified). Defendants did not enforce a standard enacted to "superficially connect[]" an otherwise invalid tax with "alcohol regulation." *See Gerlach*, 155 F. Supp. 3d at 999–1000. As state law makes clear, the public convenience and advantage standard addresses multiple state interests related to liquor regulation. *See* ABCL § 2 (public convenience and advantage standard seeks to promote "health, welfare and safety"; foster "temperance"; "and, to the extent possible, "support[] economic growth, job development"). These state interests are similar to those that, according to the Supreme Court, have justified the historical tradition of concurrent jurisdiction between states and native governments, given the "significant impact" liquor distribution may have "beyond the limits of" a reservation. *See Rehner*, 463 U.S. at 724.

To be sure, Plaintiffs argue that the public convenience and advantage standard's discretionary nature allows Defendants to impose licensure conditions federal law does not permit—based on "subjective assessments of market saturation, competitive sales, or the perceived 'need' for an additional store," which are "untethered to liquor safety or temperance." (*See* Dkt. No. 20, at 19, 22–23). That standard exceeds the "authority Congress contemplated in" § 1161, Plaintiffs say, and to hold otherwise would give states "a de facto power to block" alcohol sale on native land altogether, rendering § 1161 "irrelevant." (*See id.* at 16–18, 24).

However, Plaintiffs cite no authority for the proposition that the *Rehner* analysis does not apply to liquor regulations that involve discretionary standards. They rely heavily on their contention that neither the text of § 1161, its legislative history, nor *Rehner* discuss discretionary standards. (*See* Dkt. No. 20, at 15–17, 20–21). Citing Justice Blackmun's dissent in *Rehner* and other Supreme Court cases concerning taxation, Plaintiffs argue that this "silence is consequential" because "the Supreme Court has consistently required clear congressional

authorization before finding that federal statutes subject Indian country to state regulatory control, particularly where licensing and discretionary scheme are concerned." (*See id.* at 16–17, 21). But such "generalizations" in this area of the law are often "treacherous." *See Bracker*, 448 U.S. at 141 (citation modified). As to "the narrow context of" liquor regulation specifically, the *Rehner* majority concluded that clear or express authorization "is not necessary" given "the lack of tradition of self-government." *See Rehner*, 463 U.S. at 723, 731. And even were express authorization required, the majority further explained, Congress did so in enacting § 1161. *See id.* at 732 & n.16 (citing *McClanahan v. State Tax Comm'n of Ariz.*, 411 U.S. 164, 177 n.16 (1973)). In light of the state interests described above, as well as the historical tradition discussed in *Rehner*, there appears no basis to treat the liquor regulation at issue here differently than any other liquor regulation allowed under § 1161. Accordingly, Plaintiffs' § 1161 claim must be dismissed. *See id.* at 726.

**D. Dormant Commerce Clause**

Finally, Defendants argue that the second amended complaint fails to state a plausible Commerce Clause claim. (*See* Dkt. No. 17-1, at 48–56; *see also* Dkt. No. 26, at 16–18). Plaintiffs disagree. (*See* Dkt. No. 20, at 44–49).

"The Commerce Clause vests Congress with the power to regulate [c]ommerce among the several [s]tates." *Variscite NY Four, LLC v. N.Y. State Cannabis Control Bd.*, 152 F.4th 47, 60 (2d Cir. 2025) (citation modified); U.S. Const. art. I, § 8, cl. 3. The Supreme Court has long interpreted that clause "to prohibit[] state laws that unduly restrict interstate commerce." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 514 (2019). This "negative implication known as the dormant Commerce Clause," *Rest. L. Ctr. v. City of New York*, 90 F.4th 101, 118 (2d Cir. 2024) (citation modified), "prohibits the enforcement of state laws driven by economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by

burdening out-of-state competitors," *Variscite NY Four*, 152 F.4th at 60 (quoting *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023)).

"A state statute may violate the dormant Commerce Clause in several ways." *Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 216 (2d Cir. 2004). Relevant here, "[a] law that clearly discriminates against interstate commerce in favor of intrastate commerce is virtually invalid per se and will survive only if it is 'demonstrably justified by a valid factor unrelated to economic protectionism.'" *Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 47 (2d Cir. 2007) (quoting *Wyoming v. Oklahoma*, 502 U.S. 437, 454 (1992)). Discrimination in this context "means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Variscite NY Four*, 152 F.4th at 63 (quoting *N.Y. Pet Welfare Ass'n, Inc. v. City of New York*, 850 F.3d 79, 89 (2d Cir. 2017)). "A law may discriminate against interstate commerce 'on its face, harbor a discriminatory purpose, or discriminate in its effect.'" *Id.* (quoting *N.Y. Pet Welfare Ass'n*, 850 F.3d at 90); *Town of Southold*, 477 F.3d at 48.

Plaintiffs here have plausibly alleged that Defendants' denial of the liquor license application discriminated against interstate commerce. The ABCL declares New York's policy to include, "to the extent possible, supporting economic growth, job development, and the *state's alcoholic beverage production industries* and its tourism and recreation industry." *See* ABCL § 2 (emphasis added). The Authority's written decision denying Plaintiffs' application expressly invoked this statutory language—noting that Plaintiffs "expressed no interest in providing to customers a product mix that included wines from the Finger Lakes region or other New York State liquor or wines." (Dkt. No. 16-36, at 4). The decision also noted that the proposed store "would not necessarily sell any of the wines of the region, or any other alcoholic beverages manufactured in New York State and [Plaintiffs] *would not commit* to selling a specific p[er]cent

of New York State Products." (*Id.* (emphasis added)). Plaintiffs further allege that the Commissioners pressed Plaintiffs on their "decision to not 'commit' to selling a fixed percentage of New York-made products." (Dkt. No. 16, at 19).

Defendants cite other reasons given for the denial of the application and assert that the "decision to deny plaintiffs' application was not based—solely or partially—on their refusal to sell a certain percentage of New York made product." (*See* Dkt. No. 17-1, at 51–54). As an initial matter, Defendants' arguments rely heavily on statements taken from a video of the October 2025 full board meeting. (*See id.*). On a Rule 12(b)(6) motion, the Court ordinarily cannot consider materials outside the complaint. *See Pearson*, 125 F.4th at 406. In any event, even were the Court to consider those facts, the written decision specifically relies on the refusal to commit to selling a certain percentage of New York products. (*See* Dkt. No. 16-36, at 4). And at this stage, the Court must accept Plaintiffs' allegations as true and draw all reasonable inferences in their favor. *See Faber*, 648 F.3d at 104.

Because the decision to deny Plaintiffs' application facially evinced protectionism and discrimination against out-of-state products, it must be "demonstrably justified by a valid factor unrelated to economic protectionism." *See Town of Southold*, 477 F.3d at 47. Here, as described above, Plaintiffs have alleged that no valid factor justified the preferential treatment for New York products that factored into the decision to deny their application. Although Defendants say other reasons supported that denial, they proffer no non-protectionist reasoning justifying the plausibly alleged preferential treatment. So at this stage, the Court declines to dismiss Plaintiffs' dormant Commerce Clause claim. In light of this conclusion, the Court need not address the parties' *Pike* balancing and extraterritorial arguments. *Cf. Freedom Holdings*, 357 F.3d at 216 (describing those standards as among the "several ways" a "state statute may violate the dormant

Commerce Clause"); *VIZIO, Inc. v. Klee*, 886 F.3d 249, 254–60 (2d Cir. 2018) (analyzing extraterritoriality and *Pike* balancing theories in the alternative).

## V. CONCLUSION

For these reasons, it is hereby

**ORDERED** that Proposed Amicus's motion for leave to file an amicus curiae brief (Dkt. No. 28) is **DENIED**; and it is further

**ORDERED** that Defendants' motion to dismiss (Dkt. No. 17) is **GRANTED in part** and **DENIED in part** as set forth above; and it is further

**ORDERED** that each of Plaintiffs' claims against the Authority, except for their Commerce Clause claim, are **DISMISSED without prejudice**; Plaintiffs' 42 U.S.C. §§ 1981, 1983, and 1985 claims, as well as their state law claims, against the individual Defendants are **DISMISSED without prejudice**; and Plaintiffs' 18 U.S.C. § 1161 claims against the individual Defendants are **DISMISSED with prejudice**.

**IT IS SO ORDERED.**

Dated: September 23, 2026
Syracuse, New York

Brenda K. Sannes
Brenda K. Sannes
Chief U.S. District Judge